**Steven Ray LAWSON, Petitioner–Appellee,**

v.

**Robert G. BORG, Warden, Respondent–Appellant.**

**No. 95–15062.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 1995.

Decided July 18, 1995.

Thomas Y. Shigemoto, Deputy Atty. Gen., Sacramento, CA, for respondent-appellant.

Dennis P. Riordan, Riordan & Rosenthal, San Francisco, CA, for petitioner-appellee.

Before: TANG, SCHROEDER and TROTT, Circuit Judges.

Opinion by Judge SCHROEDER; Dissent by Judge TROTT

SCHROEDER, Circuit Judge:

Robert Borg, warden of the Folsom State Prison, appeals the district court's judgment granting California state prisoner Steven Ray Lawson's 28 U.S.C. § 2254 habeas petition challenging his conviction for first degree murder. Borg argues the grant of habeas should be reversed because (1) the district court should not have held an evidentiary hearing on Lawson's juror misconduct claim; (2) any claim of juror bias has not been properly exhausted in the state courts; and (3) any juror misconduct resulted in harmless error. We hold the district court committed no error and affirm its judgment granting habeas relief on the ground that, during jury deliberations, one juror committed serious and prejudicial misconduct when he conveyed to other jurors information received out of court about the defendant's violent reputation.

## BACKGROUND

On June 28, 1984, petitioner-appellee Steven Lawson and a friend, Mark Chandler, drove to the home of Marty Avila, who owed Chandler money. Lawson and Chandler brandished guns at Marty and his wife, Charlcia Avila, when they emerged from their home. In the course of the confrontation, Marty Avila shot Chandler. Lawson then shot and killed Marty Avila.

The jury found Lawson guilty of first degree murder and found "true" the special circumstance allegation that he had committed the murder while engaged in an attempted robbery. Cal.Penal Code §§ 187; 190.2(a)(17)(i).[1] The prosecutor had rested its theory of the case on the felony murder rule, arguing that Lawson shot the victim while attempting to rob him. The jury was properly instructed that in order to find the special circumstance that Lawson was attempting robbery, it had to find a specific intent to rob.

Lawson asserted a "claim of right" defense in order to negate any felonious intent to rob.

---

1. Cal.Penal Code § 190.2 provides in relevant part:

The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been found ... to be true:
....

(17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies: (i) Robbery in violation of Section 211 or 212.5.
....

Cal.Penal Code § 190.2(a)(17)(i).

He argued that he had a good faith but mistaken belief in his right to the property sought as payment for the debt to Chandler. The jury deliberated for five days. Two questions posed to the judge during deliberations indicate the difficulty the jury had in deciding the special circumstance issue:

[ (1) ] Does the intent to collect a debt change to attempted robbery because of the use of firearms[?]

[ (2) ] How much force can be lawfully used to collect a debt before the actions constitute robbery or attempted robbery[?]

The trial court answered with supplemental instructions that directed the jury to consider the degree of force when it decided the special circumstance issue:

One may not lawfully use force or the threat of force to collect a debt. *The degree of force used is one of the circumstances for your consideration in determining whether there existed an intent to collect a debt or to commit a robbery.*

(Emphasis added).

The jury returned a verdict of guilty on all counts: first degree murder with special circumstances, attempted robbery, and two counts of false imprisonment. After a separate penalty phase deliberation, the jury recommended life without parole. Several jurors submitted a note to the trial judge requesting that the court consider the possibility of parole for Lawson, indicating that they did not agree with the penalty choices they felt constrained to make.

In July of 1986, Lawson moved for a new trial based on a claim of juror misconduct. He alleged that juror Scott had made statements during guilt phase deliberations regarding Lawson's reputation for violence. The motion was accompanied by several sworn declarations from jurors at Lawson's trial.[2] The state filed a brief in opposition to Lawson's misconduct claim, submitting supporting declarations from three other jurors, Bentley, Fitzpatrick and Gossett.

The trial court denied the new trial motion as well as the defense's request for an evidentiary hearing. In its written order rejecting Lawson's claim of juror misconduct, the trial court noted that "[t]he inference raised by affidavits of Jurors Ross, Dahl, and Emery were [sic] refuted by affidavits of Bentley and Fitzpatrick."

The Third Appellate District of the California Court of Appeal rejected the misconduct claim and affirmed Lawson's convictions. The court did not reach Lawson's claim that the trial court erred in refusing to call an evidentiary hearing because that issue was pending before the California Supreme Court in *People v. Hedgecock,* later decided at 51 Cal.3d 395, 272 Cal.Rptr. 803, 795 P.2d 1260 (1990). The Third District held, "[a]ssuming *arguendo* that juror Scott did commit misconduct, we are convinced that no prejudice to defendant resulted." Lawson's petition to the California Supreme Court was initially granted but ultimately dismissed, rendering his conviction final.

Following exhaustion of the misconduct claim in the California state courts, Lawson sought habeas in the district court. The magistrate judge ordered an evidentiary hearing on the claim of juror misconduct. In its written Findings and Recommendations, the magistrate judge found that extrajudicial information regarding Lawson's propensity for violence had been introduced by juror Scott during the guilt phase of jury deliberations. The magistrate judge found that the testimony of the three jurors reporting Scott's improper statements was more credible than Scott's denials or the jury foreman's testimony that such statements had not been made. Although the magistrate judge found

---

2. Juror Ross swore that juror Scott had stated during deliberations "that he had talked to several people who knew Steve Lawson since the case started—about Steve's personality—and they all said that Steve was very violent." Juror Emory recalled that "[d]uring deliberations on guilt Harlow Scott said that he's heard about Steve Lawson ... around town that Lawson did not have a very good reputation." Juror Dahl declared, "I recall Harlow Scott ... state[d] to the rest of the jurors that Steve Lawson had a violent temper. Scott said he knew this because he personally had checked on Steve and had gone around town talking to people about Steve."

The defense also submitted the declaration of its investigator, Barbara Yaley, reporting a conversation with Scott in which Scott allegedly admitted imparting to his fellow jurors information that he had obtained from external sources.

that the extraneous information imparted by Scott's misconduct was "serious and decidedly improper," he concluded, after noting that the determination was "extremely close," that the misconduct "did not cause substantial and injurious effect on the outcome."

On review, the district court found the magistrate judge's factual findings amply supported by the evidentiary record but the court rejected the finding of no prejudice. The district court accepted the following facts found by the magistrate judge:

(1) that Scott denied knowing petitioner on voir dire; (2) did in fact know people who knew petitioner, including former co-workers, and worked in an environment where the case was frequently discussed; (3) conducted an out-of-court investigation into petitioner's reputation and propensity for violence during the course of the trial; (4) reported his findings to at least three other jurors during the course of deliberations; and (5) later denied making such statements.

Turning to the issue of prejudice, the district court concluded that Scott's misconduct could not be deemed harmless.

Appellant timely filed a notice of appeal with this court. We have jurisdiction, 28 U.S.C. § 2253, and we affirm the district court's order.

**DISCUSSION**

I. Propriety of Evidentiary Hearing

■ The state first contends that the magistrate judge improperly held an evidentiary hearing on the issue of juror misconduct. We reject this argument.

State court factual findings are presumed correct on habeas review unless one of eight exceptions listed in 28 U.S.C. § 2254(d) applies. One such exception, a finding "that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing," 28 U.S.C. § 2254(d)(2), is applicable to the instant case. Here, the trial court refused to hold an evidentiary hearing and resolved the factual issue of alleged juror misconduct solely on the contradictory declarations submitted by the prosecution and defense.

Under the standard announced in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), the magistrate judge properly ordered an evidentiary hearing on the issue of juror misconduct. "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." *Id.* at 313, 83 S.Ct. at 757. In light of the content of the allegations and the seriousness of the alleged misconduct, the magistrate judge did not abuse his discretion in ordering an evidentiary hearing that ultimately established the existence of juror misconduct. *See United States v. Angulo*, 4 F.3d 843, 847 (9th Cir.1993).

II. Exhaustion

The state urges dismissal of Lawson's habeas petition under the "total exhaustion" rule of *Rose v. Lundy*, 455 U.S. 509, 520, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982) (each claim raised by petitioner must be exhausted before district court may reach the merits of any claim in habeas petition). The state contends that Lawson argued before the district court an unexhausted claim of juror bias independent of his exhausted claim of juror misconduct. The state's exhaustion theory borders on frivolous.

The district court understood that Lawson sought to "overturn [his] conviction on the single ground that information outside the evidence of record was presented by one of the jurors during deliberations." Furthermore, the district court's order made clear that it vacated Lawson's conviction on a finding that "the extrinsic evidence substantially and injuriously influenced the verdict."

Although the evidentiary hearing revealed that Scott had lied on voir dire when he denied prior knowledge about Lawson and Lawson's case, the district court did not grant habeas relief on this ground. The magistrate and district court judges properly considered this dishonesty in assessing the

credibility of Scott's denials that he had engaged in the alleged misconduct during deliberations. The court issued its writ solely on the exhausted claim of Scott's misconduct in imparting extraneous information to his fellow jurors during deliberations.

### III. Prejudice

 Jury exposure to facts not in evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment. *Dickson v. Sullivan,* 849 F.2d 403, 406 (9th Cir.1988); *see also Jeffries v. Blodgett,* 5 F.3d 1180, 1191 (9th Cir.1993) (introduction of extraneous prior bad acts evidence during deliberations constitutes error of constitutional proportions), *cert. denied,* — U.S. —, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994). However, a petitioner is entitled to habeas relief only if it can be established that the constitutional error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* — U.S. —, — & n. 9, 113 S.Ct. 1710, 1722 & n. 9, 123 L.Ed.2d 353 (1993). Whether the constitutional error was harmless is not a factual determination entitled to the statutory presumption of correctness under 28 U.S.C. § 2254(d). *Dickson,* 849 F.2d at 405; *Marino v. Vasquez,* 812 F.2d 499, 504 (9th Cir.1987). Therefore, we do not defer to the California Third Appellate District's finding that Lawson suffered no prejudice. We review the district court's prejudice determination de novo. *Lowry v. Lewis,* 21 F.3d 344, 345 (9th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 513, 130 L.Ed.2d 420 (1994).

 Several factors are relevant to determining whether the alleged introduction of extrinsic evidence constitutes reversible error:

(1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of ... whether the introduction of extrinsic material [substantially and injuriously] affected the verdict.

*Bayramoglu v. Estelle,* 806 F.2d 880, 887 (9th Cir.1986), *quoted in Jeffries v. Blodgett,* 5 F.3d 1180, 1190 (9th Cir.1993) (noting that "none of these factors should be considered dispositive").[3] When assessing prejudice claims in juror misconduct cases, this court also places great weight on the nature of the extrinsic evidence introduced. *See Jeffries,* 5 F.3d at 1190–91; *Dickson,* 849 F.2d at 406–07; *Marino,* 812 F.2d at 506.

 Here, juror Scott introduced the extrinsic evidence on the second of five days of protracted guilt-phase deliberations, well before a verdict was rendered. *See Gibson v. Clanon,* 633 F.2d 851, 855 (9th Cir.1980) (nine hours of deliberation deemed protracted), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981); *see also Dallago v. United States,* 427 F.2d 546, 559 (D.C.Cir.1969) (five days protracted).

Furthermore, the extrinsic information directly related to a material issue in the case: intent. *See Jeffries,* 5 F.3d at 1190; *Dickson,* 849 F.2d at 407. In Lawson's case, proof of intent to commit robbery was pivotal to establishing the special circumstance of attempted robbery alleged by the prosecution. It is clear from the jury's questions to the court, in which the jury sought clarification of how use of force should effect a finding of intent to commit robbery, that use of force was the subject of extensive deliberations. In light of the trial court's response, which linked the "degree of force used" to the determination of intent, any extrinsic evidence of Lawson's use of force necessarily bore directly on this central question.

This court has observed that "reversible error commonly occurs where there is a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, and where the misconduct relates di-

---

**3.** The bracketed material in factor five reflects the prejudice standard later announced in *Brecht,* — U.S. at —, 113 S.Ct. at 1722.

rectly to a material aspect of the case." *Marino,* 812 F.2d at 506 (citation omitted). Such a direct connection is present here. The situation is analogous to the circumstances in *Dickson,* in which a deputy sheriff commented to the jury that the defendant had "done something like this before." *Dickson,* 849 F.2d at 407. Here, as in *Dickson,* the extrajudicial information "was both directly related to a material issue in the case and highly inflammatory." *Id.*

We reject the state's alternative arguments that Scott's misconduct was harmless because the information imparted was either cumulative of properly admitted evidence or rendered insignificant by overwhelming evidence of guilt. Evidence introduced at trial concerning violent acts committed by Lawson was far from conclusive as to Lawson's intent to rob.[4] Indeed, the jury struggled during deliberations with the question of "how much force can be lawfully used to collect a debt." Given the materiality of the interrelated issues of intent and use of force, Scott's statements that petitioner "was very violent" and "had a violent temper" cannot be deemed harmless. *See Jeffries,* 5 F.3d at 1190 (" 'The inquiry cannot be merely whether there was enough to support the result apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.' ") (quoting *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

■ Lastly, our finding of prejudice is not swayed by the state's contention that not all of the jury members were exposed to the extrajudicial evidence. The number of jurors affected by the misconduct does not weigh heavily in the prejudice calculus for even a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict. *Dickson,* 849 F.2d at 408; *United States v. Hendrix,* 549 F.2d 1225, 1227 (9th Cir.), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *Parker v. Gladden,* 385 U.S. 363, 366, 87 S.Ct. 468, 471, 17 L.Ed.2d 420 (1966) (A defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").

## CONCLUSION

On the facts found by the magistrate judge, we cannot conclude that the juror misconduct was harmless. Given the length of deliberations, the early stage at which the extrinsic information was introduced, our knowledge that the jury was troubled by the issue of intent and its relation to use of force, and the centrality of this issue to the special circumstance constituting first degree murder argued by the prosecution, we hold that the juror misconduct substantially and injuriously influenced the verdict. *See Brecht,* —— U.S. at ——, 113 S.Ct. at 1722.

The district court's grant of petitioner's writ of habeas corpus is AFFIRMED unless the State of California elects to initiate proceedings for a new trial within 45 days.

TROTT, Circuit Judge, Dissenting:

For the reasons given by Magistrate Judge Hollows in his thorough Findings and Recommendations dated June 8, 1994, I respectfully believe that the error in this case has not been demonstrated to have had any substantial and injurious effect on the jury's verdict. Thus, I would reverse the judgment of the district court. Because I cannot improve on Judge Hollows' excellent analysis, I

---

**4.** The evidence at trial showed that Lawson was a cocaine drug trafficker; that prior to going to Avila's house, Lawson got in an argument with his girlfriend's mother and discharged a shotgun into her waterbed; and that he discussed with Chandler the possibility of shooting Marty Avila, the alleged debtor, in the foot to make him comply with their demands for payment. The strongest evidence of Lawson's intent to kill Marty Avila came from Charlcia Avila who testified that Lawson said to Avila on the night of the crime: "I have a contract on you," "I will blow your head off right now," and "I'm going to kill you.

I have to kill you. I'm going to kill you right now."

On the other hand, Charlcia admitted on cross-examination that she had given false versions of the events in order to protect herself from prosecution on drug charges. Lawson's own statements to the police after his arrest were introduced and indicated that he said he had gone to the Avilas to help Chandler collect a $150 debt, that he had accompanied Chandler because Chandler was scared of Marty Avila and that Lawson had specifically stated "I wasn't going to rob this man."

will simply quote it (without indentation or footnotes) as it pertains to this key issue:

### Findings and Recommendations

2. *The Scott Information Did Not Have a Substantial and Injurious Effect on the Jury's Verdict*

The court does not understand respondent to dispute the seriousness of the juror misconduct alleged against Scott in the sense that submission of extraneous information on the issues of the case is serious in the abstract—indeed the receipt of extraneous information is constitutional error. Certainly, the facts of *Dickson* illustrate the potential seriousness of the misconduct here. However, respondent reasonably questions the seriousness of the prejudicial effect of the receipt of the prejudicial information on the jury verdict.

As referenced above, the Ninth Circuit mandates that the analysis of the prejudice of juror misconduct is judged by the current, habeas harmless error standard announced in *Brecht* adopting the test set forth in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946):

'The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'

*Jeffries,* 5 F.3d at 1190.

*Jeffries* listed several factors that might be of assistance in determining whether the error had substantial effect, and the court will analyze those *infra.* However, the ultimate question is whether it can be concluded that extrinsic evidence had a substantial effect on the verdict. The court will commence its objective prejudice analysis with this point in mind.

When viewed totally in the abstract, this court maintains its previously expressed opinion that the misconduct was prejudicial. As set forth above, the amount of force used by petitioner on the day of the homicide was an important issue in determining the intent of the petitioner to rob and kill his victim.

As it is in many murder cases, intent was a critical and hotly disputed issue determined from inferences of conduct on the incident day. The court quotes from its prior order:

On the issue of prejudice, the Court of Appeal held:

Defendant's reputation and violent personality, however, was simply irrelevant to either side's theory of the case. The record indisputably shows that defendant acted with great violence during the fatal encounter with the Avila family....

\* \* \* \* \* \*

The issue at trial was not *whether* defendant acted violently but, rather, the *meaning* of the violence.... Nothing in Scott's alleged misconduct could have distracted the jury from their consideration of the meaning of defendant's admittedly violent and stupid conduct.

Appellate Opinion at 18–19.

This court does not disagree with the Court of Appeal that the "meaning" of the violence was the important issue with which the jury had to grapple. However, some of the most potent evidence that can be utilized to determine that meaning is evidence of "prior bad acts" or "reputation." That is, if a person is predisposed to violence, and has exhibited that violence before, it is much more likely that the defendant intended to be violent in a meaningful way with respect to the act at issue, i.e., he exhibited the specific intent to steal as opposed to some other less sinister motive. Indeed, rules of evidence have emphasized the significance of such outside character evidence in proving an accused's propensity to act in a certain manner, Fed.R.Evid. 404(a), or intent, motive, and the like on a given occasion— Fed.R.Evid. 404(b). Although the petitioner was certainly violent on the day of the incident, the meaning of that violence—an issue that apparently troubled the jury— could well have been decided based on past acts or reputation.

Nor is it important that not all jurors may have been affected. If even one juror was tainted, the Ninth Circuit has held that the

defendant has been denied a fair trial. *Dickson,* 849 F.2d at 408.

Order, November 2, 1993.

Moreover, Fed.R.Evid. 404(a), 405(a), and state evidence rules like it, specifically note that reputation in the community may be utilized to prove a trait of character of the accused. The court assumes that the evidence rule is premised upon the fact that such information is probative, and can affect the outcome of a verdict.

Nevertheless, the jury in this case did not decide the verdict in the abstract. It decided the verdict with all the evidence in mind—record evidence that included several violent acts on the part of petitioner. In comparing the admissible evidence of petitioner's violence with the extraneous evidence, the court finds the effect of the reputation evidence describing an extraneous propensity for violence to have been diluted to the point where it did not have a substantial and injurious effect on the verdict.

As noted by respondent, the evidence *at trial* showed that petitioner had scouted the house of the victim prior to arriving at that residence with guns drawn and camouflage clothing. RT 424. The evidence showed that petitioner was a cocaine drug trafficker—an occupation quite frequently associated with violence. Just prior to going to Avila's house, petitioner discharged a shotgun into his girlfriend's mother's waterbed, RT 436, 468, having had a previous argument with his girlfriend's mother. Petitioner actively discussed shooting Avila in the foot for compliance purposes. RT 467. After petitioner and his co-defendant confronted the victim Avila, violence was used right away, i.e., the victim was compelled to get on his knees at gunpoint. Petitioner (who was characterized as the "driver" of the vehicle that pulled up to the Avila residence) shouted in a very "violent" voice for Avila to get on his knees and, " 'I have a contract on you. You are dead, motherfucker.' " RT 217. Later, petitioner held Mrs. Avila on her stomach at gunpoint; when she attempted to get up, petitioner put the shotgun to her head and responded: " 'You think you are getting up, Bitch? I will blow your head off right now.' " RT 222. Still later, Mrs. Avila was able to temporarily escape, and get her child while in the process of being chased by petitioner. He told her: " 'I'm going to kill you. I have to kill you. I'm going to kill you right now.' " RT 234.

Meanwhile, Mr. Avila had somehow been able to go into his house to procure a weapon, come back outside, and shoot petitioner's co-defendant. Petitioner then ran to where Avila was present, and shot him with the shotgun.

Again, the issue before the court is whether the extraneous information about Lawson's reputation or propensity for violence added to the information already before the jury, such that a reasonable juror could not but have been significantly affected by presentation of the extraneous evidence. In the scheme of evidentiary impacts, the vivid and specific instances of violence are sufficiently more damaging to petitioner than the later confirmatory reputation evidence such that this court concludes that the reasonable juror would not be significantly affected.

In addition, the other criteria for judging the impact of juror misconduct referenced in *Jeffries* weighs on balance in favor of finding the lack of a significant (substantial and injurious) impact. The extraneous material was evidently received in such a manner that not all jurors heard the statements. The evidence at evidentiary hearing demonstrated that no juror discussed the extraneous material at any length. The statements were made, and the jury went on to other evidence in their deliberations. However, the jury did receive the extraneous material prior to the time any verdict had been formed, and this one criteria weighs in favor of the petitioner.

The parties should not believe that this court has not struggled with the decision here. The determination here is extremely close. The defense case produced colorable evidence that petitioner and his co-defendant had not formed any specific intent to kill or rob, but simply, stupidly let an initial "scare tactic" escalate to the point where events went out of control, and a homicide occurred. There is the possibility that jurors, who were on the fence about the evidence of intent were finally confirmed in their decision to

vote guilty on first degree murder with special circumstances on account of the confirmation of petitioner's violent tendencies. However, while the court recognizes this possibility, it ultimately believes that the confirmatory evidence has been demonstrated to be less than "substantial and injurious."

ACCORDINGLY, this court [Judge Hollows] recommends that the petition for habeas corpus be denied.