Vincent Scott VIGIL, Petitioner–
Appellant,

v.

Aristedes W. ZAVARAS and the Attor-
ney General of the State of Colo-
rado, Respondents-Appellees.

No. 01–1023.

United States Court of Appeals,
Tenth Circuit.

July 23, 2002.

Howard A. Pincus, Assistant Public Defender (Michael G. Katz, Federal Public Defender, with him on briefs), Denver, CO, for Petitioner–Appellant.

Roger G. Billotte, Assistant Attorney General (Ken Salazar, Attorney General, with him on brief), Denver, CO, for Respondents–Appellees.

Before EBEL, GIBSON,* and PORFILIO, Circuit Judges.

EBEL, Circuit Judge.

Vincent Scott Vigil, the Petitioner Appellant, is currently serving a twenty-four-year sentence in Colorado state prison for committing sexual assault in the first degree and committing a violent crime with a deadly weapon while committing first-degree sexual assault. Vigil seeks a writ of habeas corpus from this court, arguing that his Sixth Amendment rights were violated when the jury that convicted him considered evidence beyond that produced at trial. The United States District Court for the District of Colorado denied Vigil relief, but issued a certificate of appealability pursuant to 28 U.S.C. § 2253, and this appeal followed. Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, we affirm.

---

* The Honorable John R. Gibson, Circuit Judge, the United States Court of Appeals for the Eighth Circuit, sitting by designation.

## I. *Background*

Sometime between 4:00 a.m. and 4:28 a.m. on the morning of July 2, 1982, a man appeared outside the bedroom window of seventeen-year-old Christina Wagner, identified himself as Scott, told Wagner that her former boyfriend, Cesar Pedraza, was "hurt," and asked Wagner to come outside and help Pedraza. Wagner did not actually see the person outside her window. Once the man identified himself as Scott, however, she recognized the voice as belonging to Vigil, who was Pedraza's ex-roommate and who had known Wagner for approximately two years.[1] Wagner then got out of bed, changed out of her night clothes, put on underwear, jeans, and a sweatshirt, picked up a wet washcloth and a towel, and proceeded out the backdoor of her home. Once outside, Wagner walked around the side of the house and moved toward the front of the home, at which point she saw a Jeep that she believed to belong to Vigil and to contain the allegedly injured Pedraza.[2] Wagner testified that as she passed the driveway, Vigil startled her by emerging from a nearby bush. Wagner said "hi" to Vigil and then proceeded toward the Jeep.

According to Wagner, Vigil then approached her from behind "put his arm around [her] neck and a knife to [her] throat" and "walked [her] ... to between the neighbor's trees," telling her in the process that if she screamed, he would kill her. Wagner further testified that Vigil pushed her to the ground and told her to take off her jeans, which Wagner then pulled to her knees. Vigil then removed Wagner's underpants, as well as a tampon she had been wearing, and raped Wagner, Wagner testified. Twice during the assault, Wagner screamed and attempted to fight off Vigil; Vigil responded to Wagner's resistance by strangling her, and eventually Wagner passed out. Three neighbors testified that they heard screams near the Wagner residence sometime between 4:25 a.m. and 4:28 a.m. on July 2.

As Vigil points out in his briefs on appeal, the prosecution's case depended heavily upon Wagner's testimony and circumstantial evidence. Not surprisingly, Vigil attacked both during the trial. First, he emphasized that despite running a series of tests, the prosecution never produced physical evidence linking Vigil to the crime. In addition, Vigil's defense counsel emphasized that the medical personnel who examined Wagner hours after the attack did not find any evidence conclusively indicating that sexual penetration occurred during the assault, a required element for first degree sexual assault. Vigil's defense counsel also emphasized problems with Wagner's credibility, noting, for instance, how she claimed to have seen Vigil's face clearly when he jumped out of the bush, but also acknowledged that it was very dark outside at the time of the attack and that a neighbor's trees obstructed most of the streetlight.

During his defense, Vigil also emphasized the issue of timing. Vigil produced undisputed testimony that he spent the evening of July 1 and early morning hours

---

1. The trial transcripts indicate that Vigil's friends refer to him by his middle name, Scott, as opposed to his first name, Vincent.

2. Vigil owned a Jeep that he had recently painted red; the Jeep's original color was white. Several neighbors testified that they saw a dark-colored Jeep drive away from the home shortly after hearing Wagner's screams.

At a preliminary hearing, Wagner testified that she saw a white Jeep, which was the color of Vigil's Jeep at the time Wagner came to know him. At trial, Wagner, in an admitted contradiction of her prior testimony, described the Jeep she saw on July 2, 1982, as dark.

of July 2 with two acquaintances, David Busman and James Balsbaugh, going to several bars and dance clubs in the southeast Denver area. According to uncontradicted evidence, Vigil, Busman, Balsbaugh, and two women they had met earlier that evening arrived at the Village Inn Restaurant at 2:50 a.m. Busman testified that he, Balsbaugh, and Vigil left the restaurant at 4:00 a.m., and the waitress that served Vigil and his friends also testified that the group left the Village Inn sometime after four o'clock in the morning. After departing the restaurant, Vigil dropped off Busman and Balsbaugh at Busman's home, which is 12.7 miles from the Village Inn and 3.6 miles from Wagner's home.

At trial, and on appeal, Vigil agreed that Wagner had been assaulted on July 2 in some manner and that the assault occurred sometime between 4:25 a.m. and 4:30 a.m.[3] Vigil contended, however, that he could not possibly have left the Village Inn at 4:00 a.m., driven over twelve miles to Busman's house, dropped off Busman and Balsbaugh, driven another 3.6 miles to Wagner's home, knocked on Wagner's window, waited for Wagner to change her clothes and walk outside, grabbed Wagner from behind, removed her jeans and undergarments, and then sexually assaulted her by 4:25 a.m. or 4:28 a.m. To bolster this claim, Vigil introduced testimony from a defense investigator who stated that it took him twenty minutes to drive from the Village Inn to Busman's house at 4:00 a.m., going the posted speed limit. In addition, Vigil testified that he, Busman, and Bals-

baugh left the Village Inn between 4:05 a.m. and 4:10 a.m. and arrived at Busman's home at 4:25 a.m., and that he returned to his own home at 4:35 a.m. Vigil's mother also testified in her son's defense, explaining that Vigil arrived home near 4:35 a.m.[4]

By contrast, evidence presented by the prosecution suggested that Vigil could have left the Village Inn, dropped off Busman and Balsbaugh, arrived at Wagner's home, and sexually assaulted Wagner before 4:28 a.m. Busman, for instance, testified that Vigil dropped off him and Balsbaugh at 4:15 a.m., or within a few minutes on either side of 4:15 a.m. In addition, two police officers explained that it took them eight minutes to drive from the Busman home to the Wagner residence, which, if one accepted Busman's testimony that Vigil dropped him off at 4:15 a.m., would mean that Vigil could have arrived at Wagner's home at 4:23 a.m., leaving him five minutes "to knock on [Wagner's] window" [and] "to have her get dressed [and] come out." Finally, the prosecution suggested in its closing arguments that, contrary to the suggestion made by the defense investigator, people traveling on empty roads at 4:00 a.m. drive faster than the posted speed limit, thereby insinuating that Vigil could have driven from Busman's home to Wagner's house in less than eight minutes.

Ultimately, the jury rejected Vigil's defenses and found him guilty of criminal sexual assault in the first degree. Shortly after the jury's verdict, Vigil filed a motion seeking a judgment of acquittal or, in the

---

3. Vigil questioned whether first-degree sexual assault (i.e., penetration) occurred but agreed that Wagner had been assaulted.

4. The prosecution undercut Mrs. Vigil's credibility at trial. The prosecution pointed out, for example, that Mrs. Vigil initially told police officers that her son had been at home all night only to retract her statement later. In addition, they emphasized that Mrs. Vigil's

claim that her son arrived home at 4:35 a.m. was based on the fact that she heard him pull into the driveway roughly at the same time an alarm set for 4:45 a.m. went off. Mrs. Vigil testified that she set the alarm clock ten minutes ahead, so that 4:45 a.m. was actually 4:35 a.m., a fact, according to one officer, Mrs. Vigil failed to mention in her initial conversations with the police.

alternative, a new trial. In support of his misconduct charges, Vigil cited many grounds in support of his motion, including juror misconduct. He offered an affidavit from Mildred Gonzales, a juror in his trial, alleging that a number of improprieties occurred during jury deliberations, including the use of a Bible and dictionary by the jurors. Only one of Gonzales's allegations is relevant to this appeal, however, namely that the jury considered evidence on the "timing issue" that was not presented in the course of the trial. Explained Gonzales in her affidavit:

> During the deliberations, one of the jurors who owned a plumbing business on Morrison Road said that he was familiar with the areas where the Busman home, Wagner home, and the Vigil home were located. He drew a map or diagram of the streets and showed it to the other jurors and used it to convince them that the Busman home was only a couple of blocks from the Wagner home and it would have only taken a couple of minutes for Mr. Vigil to have traveled from the Busman home to the Wagner home. This was an important consideration for the jury in the case in evaluating Mr. Vigil's alibi defense and whether he would have had the opportunity to have been close enough to the Wagner home to have committed the crime. I do recall the juror who made this map or sketch, at one point in time, was showing the sketch to a woman juror and telling her it's only a few blocks between the place Mr. Vigil said he was at and the location of the crime.

The state trial court then held a hearing where it considered Vigil's various claims, including the allegations in the Gonzales affidavit. Ultimately, the court rejected Vigil's extraneous evidence argument on the grounds that (1) the affidavit reflected the mental processes of the jury (which cannot be reviewed by courts) and (2) Vigil

had not shown he "was prejudiced in any way."

On direct appeal, the Colorado Supreme Court also rejected Vigil's argument on prejudice grounds. The court explained that it was inappropriate for the unidentified juror to state that the Wagner and Busman homes were only a short distance or a "couple" or "few" blocks from one another. *People v. Vigil*, 718 P.2d 496, 502 (Colo.1986) (en banc) ("We do not approve a juror's imparting to other jurors information, based on his personal experience that finds no support in the evidence, concerning the times and distances relevant to a case."). Nonetheless, the court—apparently rejecting a literal reading of the words "couple" and "few"—found that "the challenged information illustrated evidence presented by the prosecution" and, therefore, "that the alleged juror misconduct did not result in prejudice to the defendant." *Id.*

After his unsuccessful appeals before the Colorado courts, Vigil filed a petition in federal district court seeking habeas corpus relief. Initially, the district court adopted the magistrate judge's recommendation and denied Vigil's petition, which included additional claims not raised on appeal. The district court then vacated this judgment and reviewed the merits of the claim at issue in this appeal. Ultimately, the district court found Vigil's argument unavailing, essentially for the reasons discussed by the Colorado Supreme Court. In particular, the district court rejected the idea that the juror meant the word "couple" to be read literally ("[T]here was no evidence presented that the juror was insistent that the locations were exactly two blocks apart, or that such a trip would take exactly two minutes, nor does common sense support such a literal interpretation.") and found the juror's actions

to be nonprejudicial because they merely duplicated evidence already presented by the prosecution. This appeal followed after the district court issued a certificate of appealability (C.O.A.).[5]

## II. *Gonzales Affidavit*

Vigil argues that, looking solely at the information contained in the Gonzales affidavit, it is clear that his Sixth Amendment rights were violated and that a writ of habeas corpus should issue. We disagree.

### A. *Juror Misconduct*

■ The Supreme Court has held repeatedly that a jury's verdict "must be based upon the evidence developed at the trial." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), the Court explained that under the Sixth and Fourteenth Amendments, "trial by jury in a criminal case necessarily implies at the

very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 472–73, 85 S.Ct. 546.

■ However, in the habeas corpus context, a federal court may grant relief only where the alleged misconduct "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).[6] *Crease v. McKune,* 189 F.3d 1188, 1192 (10th Cir.1999) (applying *Brecht* in a habeas case involving an ex parte conversation between a judge and a juror). Under pre-AEDPA standards, "[w]e review legal issues de novo ...., while presuming that the findings of fact made by the state court are correct unless they are not fairly supported by the record." [7] *Fox v. Ward,*

---

**5.** Because Vigil filed his habeas petition before April 24, 1996, we apply law pre-dating the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) when evaluating the merits of his claims. *Slack v. McDaniel,* 529 U.S. 473, 481, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). However, because Vigil filed the present appeal after AEDPA's effective date, a C.O.A. must be issued before we may consider the merits. *Id.* at 481–82, 120 S.Ct. 1595.

**6.** On *direct appeal,* "[a] rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions," *Mayhue v. St. Francis Hosp. of Wichita, Inc.,* 969 F.2d 919, 922 (10th Cir.1992), but this presumption does not apply in the habeas context, *Crease v. McKune,* 189 F.3d 1188, 1193 (10th Cir.1999), as Vigil concedes in his brief. ("The presumption of prejudice ... has no application in habeas corpus cases.")

**7.** Prior to AEDPA's enactment, state court factual findings were not entitled to a presumption of correctness in seven situations, *see, generally, Case v. Mondragon,* 887 F.2d 1388, 1392–93 (10th Cir.1989), including

where: (1) the state court did not resolve the merits of the factual dispute; (2) the state's fact-finding procedure did not "afford a full and fair hearing"; (3) "the material facts were not adequately developed at the [s]tate court hearing"; (4) the state court lacked either subject matter jurisdiction or personal jurisdiction; (5) the state court proceeding violated the petitioner's constitutional right to counsel; (6) the petitioner "did not receive a full, fair, and adequate hearing in the [s]tate court proceeding"; or (7) the proceeding "otherwise denied [the petitioner] due process of law." 28 U.S.C. § 2254(d)(1)-(7) (1994). Nor did the presumption of correctness apply where "the findings of fact made by the state court ... [were] not fairly supported by the record." *Fox v. Ward,* 200 F.3d 1286, 1292 (10th Cir.2000) (citing pre-AEDPA version of 28 U.S.C. § 2254); *see also* 28 U.S.C. § 2254(d)(8) (1994). It is important to keep in mind that these factors only applied to the presumption of correctness afforded state court findings and did "not control when a federal court should hold an evidentiary hearing." *Spencer v. Zant,* 715 F.2d 1562, 1579 (5th Cir.1983); *see also Lawrie v. Snyder,* 9

200 F.3d 1286, 1292 (10th Cir.2000). However, whether juror misconduct prejudiced a defendant is a "mixed question of law and fact," *Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir.1997), *abrogated on other grounds by Mancuso v. Olivarez*, 292 F.3d 939, 944 (9th Cir.2002); *Loliscio v. Goord*, 263 F.3d 178, 187 n. 4 (2d Cir.2001) ("A Court's determination of whether a petitioner was prejudiced by a jury's consideration of extra-record evidence is clearly a mixed question of law and fact."), which, applying pre-AEDPA standards, we review de novo. *See Scrivner v. Tansy*, 68 F.3d 1234, 1238 (10th Cir.1995) (explaining that in the Tenth Circuit, mixed questions of law and fact are reviewed de novo in habeas proceedings); *Case v. Mondragon*, 887 F.2d 1388, 1393 (10th Cir.1989) ("No presumption of correctness attaches to legal conclusions or determinations on mixed questions of law and fact [made by state courts]. Those are reviewed *de novo* on federal habeas review."). During our review of mixed questions, we "continue to apply [the presumption of correctness] to any findings of fact underlying mixed questions," such as whether the jury, in fact, considered external evidence. *Case*, 887 F.2d at 1393.

■ In deciding whether outside information substantially influenced a jury's verdict (thereby prejudicing the defendant), courts cannot delve directly into jurors' mental processes. *Mayhue*, 969 F.2d at 923; *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir.1988) (collecting cases); F.R.Cr.P. 606(b). A court may consider, however, a number of other factors, such as: (1) the degree to which the jury discussed and considered the extrinsic information, *United States v. Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir. 1991); (2) the extent to which the jury had

difficulty reaching a verdict prior to receiving the improper evidence, *Mayhue*, 969 F.2d at 926; (3) the degree to which the information related to a material fact in the case, *Rodriguez*, 125 F.3d at 744; (4) when the jury received the extrinsic evidence, *Mancuso*, 292 F.3d at 951–52; (5) the strength of the legitimate evidence, *United States v. Chanthadara*, 230 F.3d 1237, 1265 (10th Cir.2000); and (6) whether the extrinsic evidence merely duplicates evidence properly before the jury. *See Rodriguez*, 125 F.3d at 744 ("[T]he introduction of duplicative or cumulative extraneous material may render juror misconduct harmless."); *Hughes v. Borg*, 898 F.2d 695, 700 (9th Cir.1990) (collecting cases from the Ninth, Eleventh, and D.C. Circuits).

### B. *Merits of Claim*

■ Applying these standards to Vigil's claim, we do not find that the information in the Gonzales affidavit demonstrates actual prejudice.

First, given the state's case and Vigil's defense, the legitimate evidence supporting Vigil's conviction appears fairly strong. Vigil admitted at trial, for example, that he had lived with Wagner's former boyfriend, Cesar Pedraza, that he knew Wagner, and that he had been at Wagner's home on at least one prior occasion. Vigil did not dispute the fact that someone assailed Wagner on July 2, 1982.

Moreover, although Vigil attempted to impugn her credibility, Wagner clearly testified that she recognized the voice of the man who appeared at her window as belonging to Vigil, that Vigil startled her moments before the sexual assault, and that during the actual sexual assault she did "not have any difficulty in seeing" that

F.Supp.2d 428, 438 & n. 4 (D.Del.1998) (distinguishing between § 2254(d)'s presumption

of correctness and when a federal court must hold an evidentiary hearing).

Vigil was the man attacking her. It was also unrebutted that Wagner told a police officer immediately following the assault that Vigil had attacked her. Importantly, as his counsel acknowledged at oral argument, Vigil never suggested that Wagner lied when she identified Vigil as her assailant, but instead argued only that Wagner misperceived her attacker. Thus, in light of the evidence at trial, Vigil's defense depended upon the jury finding either (1) that Wagner innocently mistook her attacker for Vigil on several occasions during the assault or (2) that, for reasons not proffered nor argued by Vigil, Wagner lied when she identified Vigil.

The jury rejected these theories, and we do not believe that the extraneous evidence contained in the Gonzales affidavit would have "had [a] substantial and injurious effect or influence" on the jury's decision. *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. The Gonzales affidavit, after all, only went to the issue of whether Vigil could have traveled from the Busman residence to the Wagner residence in time to commit the assault. The state's case against Vigil, however, turned upon Wagner's identification of Vigil *during the actual assault*. Indeed, the prosecution acknowledged as much during its closing argument, explaining to the jury, "We have got to prove identification beyond a reasonable doubt, ladies and gentlemen. We have got to show that Scott Vigil is the man who did this," and then pointing to Wagner's testimony as proof that Vigil was in fact the attacker. Consequently, the question of distance between the homes appears secondary to a larger, more critical issue: Did Wagner accurately identify her attacker during the actual assault? A review of the trial record convinces us that the jury must have answered this question in the affirmative, and the information in the Gonzales affidavit does not directly undermine this conclusion.

Second, it appears that the extrinsic information described in the Gonzales affidavit may simply have duplicated the legitimate timing evidence before the jury. Evidence was offered, for example, showing that a person driving at the posted speed limit could have traveled between the Busman and Wagner residences within eight minutes. The prosecution further suggested that a person driving on a residential street in the early morning hours could cover the distance between the two homes in a shorter period of time. At trial, Busman testified that Vigil dropped him off around 4:15 a.m., which, if correct, would have given Vigil sufficient time to drive to the Wagner home and commit the assault. Vigil countered the prosecution's case by presenting evidence suggesting that because he dropped Busman off later than 4:15 a.m., he could not have arrived at the Wagner home in time to commit the assault.

On appeal, Vigil contends that the extrinsic information described in the Gonzales affidavit significantly shortened the time and distance between the two residences, thereby enabling the jury to conclude that he could have arrived at the Wagner residence even if he had left the Busman home later in the morning. Vigil's argument relies upon the affidavit's use of the terms a "couple of blocks," "a couple of minutes," and "a few blocks" to describe the distance between the homes.

Vigil, however, gives these terms too much weight. Unlike the testimony elicited at trial, which precisely indicated that it takes eight minutes driving at the speed limit to travel between the houses, the affidavit uses the vague and less precise terms of "couple" and "few." For example, the affidavit states that the houses were a "couple of blocks" apart and that it

would take only a "couple of minutes" to drive between them. As the state points out, a driver can easily cover two residential blocks in less than two minutes, particularly in the early morning hours, suggesting that "couple" should not be taken literally. In addition, the Gonzales affidavit later replaces the word "couple" with the word "few" when describing the distance between the Busman and Wagner residences. By alternating between the words "couple" and "few," the affidavit again implies that the terms are shorthand descriptions meaning "fairly short" or "close." In light of these considerations, we, like the Colorado Supreme Court and the district court, find that a commonsense reading of the affidavit suggests that all the unidentified juror essentially said was that Vigil could have gotten from Busman's to Wagner's in a short period of time, an argument made by the prosecution throughout the trial, and reinforced by the suggestion in its closing arguments that people drive more quickly at 4:00 a.m.

There are other difficulties with finding prejudice based strictly on the information contained in the affidavit. As Vigil's counsel conceded during oral argument, it is not at all clear whether the affidavit actually describes the extrinsic information as it was presented by the unidentified juror, or whether it represents Gonzales's interpretation of that extrinsic information. Nor does the affidavit address whether the jury had difficulty in resolving the timing issue, the degree to which the jury discussed the extraneous evidence, or when the unidentified juror introduced the evidence, all factors courts consider when evaluating prejudice in juror misconduct cases. The affidavit even equivocates on the number of jurors exposed to the extraneous information. At one part, for example, the Gonzales affidavit states that, at some point "[d]uring the deliberations," an unidentified juror drew a map "and showed it to the other jurors and used it to convinced them that the Busman home was only a couple of blocks from the Wagner home." Later on, however, the affidavit suggests that the unidentified juror may have only shown the map to one other juror. ("I do recall the juror who made this map or sketch, at one point in time, was showing the sketch to a woman juror and telling her it's only a few blocks between the place Mr. Vigil said he was at and the location of the crime.").

Under these circumstances, we cannot conclude that the Gonzales affidavit establishes the requisite prejudice for a new trial.

### III. *Evidentiary Hearing*

Vigil obliquely argues that, if we conclude that the Gonzales affidavit does not, in and of itself, establish prejudice, we should then compel the district court to hold an evidentiary hearing to resolve any lingering factual questions in this case. Again, we disagree.

■ Generally, the decision to hold an evidentiary hearing "is vested in the broad discretion of the district courts, and [is] ... review[ed] ... only for an abuse of discretion." *Davis*, 60 F.3d at 1483. *See United States v. Humphrey*, 208 F.3d 1190, 1198 (10th Cir.2000) ("How and whether to have a hearing on a claim that jurors were improperly exposed to extraneous information is within the trial court's sound discretion."); *Johnson v. Gibson*, 169 F.3d 1239, 1253 (10th Cir.1999) (finding district court did not abuse its discretion in refusing to hold an evidentiary hearing in a habeas case); *Lasiter v. Thomas*, 89 F.3d 699, 702 (10th Cir.1996) (reviewing for abuse of discretion in habeas case).

We have explained that under pre-AEDPA habeas standards, a habeas petitioner must satisfy two criteria in order to obtain a federal evidentiary hearing. First, the habeas petitioner must "make allegations which, if proved, would entitle him to relief." *Medina v. Barnes,* 71 F.3d 363, 366 (10th Cir.1995) (citing *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992)). Second, the "petitioner is entitled to a hearing in federal court only if he did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding which resulted in reliable findings." [8] *Scrivner,* 68 F.3d at 1242 (internal quotation marks omitted); *see Miller v. Champion,* 161 F.3d 1249, 1252 (10th Cir.1998); *Medina,* 71 F.3d at 369–70; *Dever v. Kan. State Penitentiary,* 36 F.3d 1531, 1535–36 (10th Cir.1994). However, a district court is not required to hold a hearing where "the *failure to develop the material fact* at the state court level was ... attributable to the petitioner's inexcusable neglect." *Dever,* 36 F.3d at 1536 (emphasis added); *Medina,* 71 F.3d at 369–70 ("[Supreme Court precedent] requires an evidentiary hearing when the facts were not adequately developed in the state court, so long as that failure is not attributable to the petitioner."). Further, a habeas petitioner claiming he is entitled to a federal evidentiary hearing because "material facts were not adequately developed at the state hearing," *Medina,* 71 F.3d at 369 n. 6, can only obtain an evidentiary hearing "if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure .... [or] that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," the Supreme Court explained in an opinion four years prior to AEDPA's enactment. *Keeney,* 504 U.S. at 11, 112 S.Ct. 1715; *see also Williams v. Taylor,* 529 U.S. 420, 433–34, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (explaining *Keeney* holding); *Medina,* 71 F.3d at 369–70 (same); *Lawrie v. Snyder,* 9 F.Supp.2d 428, 438 (D.Del.1998) (same).

■ In this case, it is clear the Colorado trial court held a *hearing* on Vigil's motion for a new trial, during which it considered a number of allegations alongside the one raised in this appeal. Vigil does not challenge the fairness of this hearing, nor does he assert that the trial court denied him an opportunity to present additional evidence clarifying or developing the allegations contained in the Gonzales affidavit.[9] *Cf. Medina,* 71 F.3d at

---

**8.** In *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Supreme Court held that a federal court entertaining a habeas petition *"must grant"* an evidentiary hearing" if

(1) the merits of the factual· dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier

of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend,* 372 U.S. at 313, 83 S.Ct. 745 (emphasis added); *see also Medina,* 71 F.3d at 369 & n. 6 (describing circumstances in which, prior to AEDPA, a federal court was required to hold an evidentiary hearing).

**9.** In fact, the state trial court refused to accept an offer of proof made by the prosecution that, it appears, could have undercut the Gonzales affidavit. Indeed, possible concerns about the weakness in the Gonzales affidavit may explain why Vigil chose not to present further evidence but rather elected to rest on the affidavit itself.

370 (explaining cases where a federal evidentiary hearing was ordered after state courts denied petitioners an opportunity to present their claims). Moreover, as Vigil's attorney conceded at oral argument, Vigil at no time requested that the Colorado courts hold an evidentiary hearing on his misconduct claim or attempted to offer other proof supporting his misconduct claim. Significantly, Vigil failed to take these steps even after the trial court granted him access to the jurors in his case. As the district court observed, "[Vigil] chose to rest" his state case on the Gonzales affidavit. Thus, any failure to develop the factual record surrounding the misconduct claim appears directly attributable to Vigil's own neglect, not the state courts' obstinance, a failure that favors rejecting his request for an evidentiary hearing in federal court. *See Keeney,* 504 U.S. at 9, 112 S.Ct. 1715 ("It is hardly a good use of scarce judicial resources to duplicate factfinding in federal court merely because a petitioner has negligently failed to take advantage of opportunities in state-court proceedings."); *Flamer v. Delaware,* 68 F.3d 710, 735 n. 24 (3d Cir.1995) ("Absent extraordinary circumstances, a habeas petitioner may not seek an evidentiary hearing on the basis of records that were available to him during the state court's proceedings but that he did not present.").[10]

Equally important, Vigil's entire argument before the trial court and the Colorado Supreme Court appears to have been that the extra-record information, as described in the Gonzales affidavit, supports a finding of prejudice, a contention rejected by both courts. As discussed earlier, Vigil takes the very same position in this court, reiterating at several points in his brief that there is "no dispute as to the historical facts of what Ms. Gonzales' affidavit says," and suggesting that "[o]n this record ... a hearing is not needed and this court can conclude relief is warranted." In essence, then, Vigil does not suggest that any material facts need to be developed regarding the allegations made in the Gonzales affidavit. *See Johnson,* 169 F.3d at 1253 ("[I]n the absence of disputed material facts, [the petitioner] did not have a right to an evidentiary hearing, and the district court did not abuse its discretion in denying him one."); *Carter v. Montgomery,* 769 F.2d 1537, 1543 (11th Cir.1985) ("[T]he district court did not err in declining to grant an evidentiary hearing to petitioner. Petitioner does not explain which facts were not developed at the state hearing, nor does he make any attempt to demonstrate their materiality."). Instead, Vigil asks this court to order an evidentiary hearing if "it believes dispositive factual questions remain" without ever indicating what those questions might be or how those questions might be answered. Given the opportunities to develop the record Vigil had before the state trial court, we reject his suggestion.

## IV. *Conclusion*

We **AFFIRM** the district court's ruling.

---

10. Vigil vaguely suggests that he is entitled to a federal evidentiary hearing because "[t]he state court did not hold 'a hearing on the merits' of the issue." In fact, as explained above, the state trial court held a hearing on Vigil's motion for a new trial, during which it discussed, and ultimately rejected, the argument that Vigil was entitled to a new trial based on the allegations in the Gonzales affidavit.