Filed 8/11/22  P. v. Taylor CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>CHARLES MARSHALL TAYLOR,<br><br>　　　Defendant and Appellant. | H046288<br>(Santa Clara County<br>Super. Ct. No. C1511498) |

A jury convicted appellant Charles Marshall Taylor of committing multiple crimes against his girlfriend, A.D., during a three-month relationship of threats, violence and torture.  The trial court sentenced him to an indeterminate term of seven years to life in prison.

On appeal, Taylor argues that the trial court (1) erroneously denied his motion for a mistrial due to the jury's exposure to one member's misconduct and (2) abused its discretion by granting the prosecutor's motion to quash a subpoena duces tecum issued for A.D.'s employment records.  Taylor also requests that this court independently review A.D.'s sealed psychiatric records to determine whether any materials should have been disclosed to the defense.  Finally, in a supplemental brief, he argues that remand for resentencing is required because he is entitled to the retroactive application of Senate Bill No. 567 (2021-2022 Reg. Sess.) and Assembly Bill No. 518 (2021-2022 Reg. Sess.).

We reverse the judgment and remand the matter for resentencing in light of recent ameliorative changes in sentencing law, but we reject Taylor's claims of trial error.

## I.  BACKGROUND

### A.  *The Information*

On June 27, 2018, the Santa Clara County District Attorney's Office filed an information charging Taylor with torture (Pen. Code, § 206[1]; count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), sodomy with an unconscious person (§ 286, subd. (f); count 3), three counts of inflicting corporal injury on a spouse, cohabitant, former spouse, or former cohabitant (§ 273.5, subd. (a); counts 4, 6, and 7), two counts of assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); counts 5 and 8), threats to commit a crime resulting death or great bodily injury (§ 422; count 9), and dissuading or attempting to dissuade a witness by use of force or threat of force (§ 136.1, subd. (c)(1); count 10).  As to counts 7 and 8, the District Attorney alleged that Taylor personally inflicted great bodily injury under circumstances involving domestic violence (§§ 12022.7, subd. (e), 1203, subd. (e)(3)).

### B.  *The Prosecution's Case*

#### 1.  *The Charged Crimes*

In 2015, A.D. and Taylor dated for approximately three months.  At the time, Taylor was employed as a mixed martial arts (MMA) fighter.  Sometime after they started dating, Taylor moved into A.D.'s house.

During their relationship, Taylor physically attacked A.D. multiple times.  Taylor routinely strangled, punched, and kicked her.  A.D. had recently finished a rehabilitation program for alcohol abuse at the time she met Taylor, but Taylor once forced vodka down her throat, telling her she was not an alcoholic.  Another time, Taylor bit A.D.,

---

[1] Unspecified statutory references are to the Penal Code.

2

burned her with a curling iron, and threatened to stick the curling iron in her vagina so she would never be able to have sex again. On another occasion, he told her that he would kill her and "skin [her]."

A.D. believed that Taylor was capable of carrying out his threats because he had told her that he used to work as a "torturer" for the "Los Zetas" gang. Taylor told her that if he were ever arrested, a family connection within the police department would procure his release within 12 hours, and that Taylor would then kill A.D. and her family.

A.D. recalled several specific incidents of abuse. One time, Taylor was angry at her and stabbed a knife toward her leg while she was lying in bed, cutting the mattress. Another time, Taylor beat her, dragged her by the hair to the bedroom, taped her mouth, and taped her arms and legs together, telling her this would give him time to go kill her family. And once, Taylor smashed A.D.'s head against her car's center console.

In May 2015, Taylor was scheduled to fight at an MMA match at the Tachi Palace Hotel. At the hotel, Taylor hit, strangled, and suffocated A.D. About a week after the incident at the Tachi Palace Hotel, A.D. and Taylor visited and stayed with Taylor's friend, Karla. While staying with Karla, A.D. seized an opportunity to get away from Taylor and drove herself to Corona, California. When A.D. reached Corona, however, she began to worry that Taylor would go after her family. About a week later, A.D. called Taylor and left him voicemails "begging him to come back" to her.

Several weeks later, A.D. and Taylor got into a fight after Taylor accused A.D. of cheating on him. Taylor punched A.D. in the face and strangled her. A.D. ran out of the house, pounded on a neighbor's door, and asked him to call the police. The police spoke to A.D. when they arrived, and A.D. told officers that she had been drinking all day before fighting with Taylor.

Taylor beat A.D. for the last time one evening after they had gone out to eat dinner with one of Taylor's friends. After dinner, Taylor became angry with A.D. and accused

3

her of wanting to "fuck his friend." Taylor dragged A.D. by her hair, punched her face, strangled her, kicked her, and choked her until she passed out. When A.D. regained consciousness, she felt Taylor sodomizing her. A.D. screamed and yelled at him to stop because it hurt. Taylor stopped after A.D. said that she needed to defecate.

In June 2015, the police came to speak to A.D. at her house. A.D. denied the sexual assault and was hesitant about cooperating with the police. She refused to get out of her bedroom and had to be taken out in handcuffs. She also declined to give her phone to the police.

Because of Taylor's repeated attacks, A.D. suffered numerous injuries. Among other things, Taylor shattered A.D.'s orbital bone, which caused numbness on one side of her face. A.D. required surgery on her nose and thumb. By the time of trial, one of her knees continued to "hurt and pop."

Because she was afraid of Taylor and believed she loved him, A.D. did not initially report Taylor to the police. A.D. sometimes considered going to the hospital for her injuries, but Taylor actively discouraged her from doing so. Taylor also limited A.D.'s access to her cell phone, which A.D. became afraid to use.

A.D. was aware that Taylor's ex-girlfriend, M.D., had previously accused him of abuse. After A.D. reported Taylor's abuse to the police, M.D. reached out to A.D. and recounted her own experience of Taylor's abuse.

A.D. admitted that she continued to struggle with alcohol issues during the relationship and had been drinking the day that Taylor was arrested. A.D. had also made certain statements to her mother about Taylor's abuse that she did not disclose to the police.

According to A.D.'s mother, A.D.'s demeanor changed after she started her relationship with Taylor. Sometimes, A.D. called her mother when she was able to get away from Taylor, and she was usually crying and hysterical on the phone. A.D. told her

4

mother about the incident at the Tachi Palace Hotel and said that Taylor threatened to kill her and her family. A.D.'s mother suspected that A.D. was still drinking alcohol when she was with Taylor, and A.D. told her mother that at one point, she was so out of touch with reality that she felt Taylor's back for the presence of angel wings.

### 2. *Expert Testimony*

A Sexual Assault Response Team examiner testified that she examined A.D. on June 10, 2015. A.D. told the examiner that she could not remember everything that happened to her because Taylor had strangled her until she lost consciousness. A.D. reported drinking prior to the examination and, at one point, was drinking two bottles of wine a day. The examiner found prominent bruises all over A.D.'s body, eye sockets, and legs. A.D. described that she suffered from memory loss, throat and neck pain, headaches, nausea, and lightheadedness. Though otherwise cooperative during the exam, A.D. declined an examination of her genital area. As part of a strangulation assessment, the examiner noted that A.D. had redness in her eyes. Based on A.D.'s appearance, the examiner believed that "she was physically beat up pretty bad."

A strangulation expert testified that strangulation can cut off the supply of blood to the brain or the flow of blood from the brain, resulting in symptoms such as petechial hemorrhages, bruises, and red eyes. Strangulation commonly does not produce external injuries but does commonly cause internal injuries, such as throat pain. Repeated strangulation can impact a victim's memory.

An expert on intimate partner violence testified that a common misconception about victims of intimate partner violence is that victims would have left a truly abusive relationship. Difficulty leaving an abusive relationship may stem from the victim's continued feelings for the abuser, reliance on the abuser for financial and logistical support, and fear that no one will believe the victim that the abuse has occurred. Victims

5

often "leave" their abuser five or seven times before they make a final break. Victims often delay reporting, fail to call the police, or lie about where their injuries are from.

### 3. *Prior Acts of Domestic Violence*

M.D. was Taylor's ex-girlfriend and was in a relationship with him on and off between 2009 and 2011. Taylor often physically and sexually abused her when they were together, and he frequently accused M.D. of cheating on him. Taylor sometimes placed M.D. in an MMA "choke hold" and strangled her. M.D. often lost consciousness when Taylor strangled her. She would sometimes fight back against Taylor but denied being the aggressor. One time, Taylor threatened M.D. by saying that he would force her to swallow her antidepressants to make it look like she had committed suicide, strangled her, and forced her to have sex. Another time, Taylor punched M.D. in the ribs while she was driving, strangled her, and later threatened her with a gun. Taylor regularly threatened to kill M.D. and M.D.'s family. At the time, M.D. believed Taylor's threats because he said that he had connections with the Hell's Angels and with the San Jose Police Department.

### C. *The Defense Case*

Taylor's father testified that Taylor dated A.D. sometime in 2015. A.D. sometimes referred to Taylor as her husband. In the days after Taylor's Tachi Palace Hotel match, A.D. called Taylor's father while intoxicated several times. Taylor's father never saw Taylor be violent with A.D., but he did see bruises on A.D. twice, once on her arm and another time on her left eye, which A.D. attributed to an ex-boyfriend.

Taylor's father also recalled that Taylor dated M.D. He saw M.D. act violently toward Taylor several times. One time, M.D. hit Taylor, but Taylor did not hit back and just let her strike him. M.D. threatened Taylor once and told him that she as going to make him spend the rest of his life in prison.

6

Taylor's friend Karla testified that she and her daughter went to watch Taylor's match at the Tachi Palace Hotel and Taylor and A.D. stayed at her house after the fight. Karla saw no visible injuries on A.D. before or after Taylor's Tachi Palace match, and she did not notice any unusual behavior between the two of them. At Karla's house, A.D. got into an argument with Taylor and told him that he was being disrespectful toward her. The following morning, Karla saw A.D. and Taylor laughing and giggling together. Karla still did not see any injuries on A.D. Later, A.D. collected her belongings and told Karla that she was leaving because Karla's "friend" beat her. After A.D. left, she exchanged several text messages with Karla. A.D. told Karla that she was waiting for Taylor in San Diego and that she loved Taylor. The next day, A.D. came back to Karla's house and tried to get Taylor to leave with her, which Taylor declined to do.

**D.**  *The Verdict and Sentencing*

On June 29, 2018, while the jury was deliberating, the trial court removed Juror No. 5 and replaced her with an alternate juror. The trial court denied Taylor's motion for a mistrial due to juror misconduct. That same day, the reconstituted jury convicted Taylor of all the charged counts and found true all the alleged enhancements.

On September 17, 2018, the trial court sentenced Taylor to seven years to life for his conviction for torture (§ 206; count 1) and imposed but stayed determinate terms for the rest of his convictions.[2]

---

[2] The trial court imposed and stayed the following determinate terms for Taylor's remaining convictions: an upper term of four years for assault with a deadly weapon (§ 245, subd. (a)(1); count 2); an upper term of eight years for sodomy with an unconscious person (§ 286, subd. (f); count 3); three upper terms of four years for inflicting corporal injury on a spouse, cohabitant, former spouse, or former cohabitant (§ 273.5, subd. (a); counts 4, 6, and 7); two upper terms of four years for assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); counts 5 and 8); an upper term of three years for threats to commit a crime resulting in death or great bodily injury (§ 422; count 9); and an upper term of four years for dissuading or attempting to dissuade a witness by use of force or threat of force (§ 136.1, subd. (c)(1); count 10). The trial

7

## II.     DISCUSSION

### A.     *Mistrial Due to Juror Misconduct*

Taylor argues that the trial court deprived him of a fair trial by only discharging a juror who had discussed during deliberations her personal experience of domestic violence—including a comment that alluded to Taylor's decision not to testify—rather than declaring a mistrial.  Because the trial court's inquiry of the remaining jurors rebutted the presumption of prejudice from the discharged juror's misconduct, we discern no error in the decision to permit deliberations to begin anew with an alternate.

#### 1.     *Background*

On June 28, 2018, a day after the jury began deliberations, Juror No. 12 sent a note to the trial court reporting that Juror No. 5 had told the other jurors that some of her past experiences were "making it difficult [for her] to be impartial."   When questioned, Juror No. 12 explained to the trial court that Juror No. 5 had discussed "her history of domestic violence" and how that "makes it difficult for her to be impartial."  Juror No. 12 stated: "[I]t was regarding I think her husband who had been arrested and there was some sort of court case to where the defendant didn't take the stand because he did not want to commit perjury, something along those lines, and she said she was afraid to disclose it.  It was a little hard to understand [Juror No. 5 because] she was really breaking down.  But that's the—the gist that I got from [her] statement."  Juror No. 12 opined that Juror No. 5 was trying to deliberate but was bringing up issues that were "specific to her experience" that were "kind of clouding" the current case.  According to Juror No. 12, all of the jurors were present when Juror No. 5 made statements about her personal experiences, and "eight to five other jurors" felt uneasy and concerned about Juror No. 5's behavior.

---

court also imposed and stayed two five-year terms for the enhancements alleged as to counts 7 and 8.

Outside Juror No. 12's presence, defense counsel requested a mistrial on the ground that Juror No. 5 had injected external matters into the deliberative process and may have tainted the jury as a whole.

The trial court questioned Juror No. 5 about whether she was having any trouble with following the jury instructions, applying the law, or being fair and impartial to both sides. Initially, Juror No. 5 denied any misconduct occurred and denied that she had omitted any information on her juror questionnaire. After being questioned several times, Juror No. 5 eventually acknowledged: "I'm not exactly sure. I'm not using—someone mentioned something about my background or something if that was—if that was having any [effect] on me [and] I said no. Does that make sense?"

The following day, the trial court questioned each juror individually. Although Juror No. 5 had denied any misconduct, the remaining jurors each expressed concerns that one juror was considering personal experiences, material, information, or topics that they had been instructed not to consider. Every other juror nonetheless affirmed that they would be able to set aside any inappropriate considerations and follow the trial court's instructions.[3]

Several of the jurors had more descriptive responses to the trial court's questions. Juror No. 1 expressed specific concerns about Juror No. 5 and stated that Juror No. 5 had discussed "past personal experiences that did not tie to the evidence that was actually presented." Juror No. 5 also "seem[ed] as if she has a personal bias based on [her] experiences that she mentions repeatedly." Juror No. 1 also described that Juror No. 5 had said that she was having a hard time, specifically with regards to "to a certain individual [(a witness)] involved with the case."

---

[3] Some of the jurors did not specifically identify Juror No. 5 as the juror who they had concerns about, but the parties do not appear to dispute that the jurors were all referring to problems stemming from a single juror: Juror No. 5.

9

Jurors Nos. 8, 9, 10, and 11 raised concerns about a fellow juror without specifically identifying which juror they were referencing. Juror No. 8 said that there had been "some personal experience references" from another juror. Juror No. 9 stated that another juror's "background" was causing that juror "a lot of emotional distress" and "angst." According to Juror No. 9, the juror in question was "saying that they are doing their very best to ensure that they are not being impartial [*sic*] to the point that I can see the angst that's happening there." Juror No. 10 said that a juror was "getting clouded" based on her past. And finally, Juror No. 11 said: "I just know there's a problem with one person and . . . I believe this person is bringing in preconceived notions and what they believe in and we weren't supposed [to]."

The trial court removed Juror No. 5, finding that she was exhibiting bias despite her denials, she was unable to follow the trial court's instructions, and she was unable to be fair and impartial. Concluding that the other jurors were "committed to their responsibilities" and "had not been prejudiced in their own abilities to be fair and impartial," the trial court denied Taylor's motion for a mistrial. The trial court also concluded that "the other jurors are making all their best efforts to follow the law and the Court's instructions including struggling with the question how to respond to and/or deal with their concerns about Juror No. 5's conduct."

After an alternate juror was selected, the trial court admonished the jury not to speculate as to the reasons why Juror No. 5 was replaced and not to consider Juror No. 5's removal for any purpose. The trial court also instructed the jury to begin deliberations anew and set aside all past deliberations.

That same afternoon, the jury reached a verdict as to all the charged counts.

### 2.      *Legal Principles*

Because a jury's verdict must be based on the evidence presented at trial and not on extrinsic matters, a juror commits misconduct by "bring[ing] outside evidence into the

10

jury room [citation], inject[ing] the juror's own expertise into the deliberations [citation], or . . . receiv[ing] . . . information about a party or the case that was not part of the evidence received at trial." (*People v. Wilson* (2008) 44 Cal.4th 758, 829.) Misconduct also includes discussing a defendant's failure to testify at trial. (*People v. Avila* (2009) 46 Cal.4th 680, 726.) A trial court informed of possible juror misconduct has a duty to investigate the allegation. (*People v. Lomax* (2010) 49 Cal.4th 530, 592.) "Juror misconduct . . . raises a rebuttable presumption of juror bias and that the defendant suffered prejudice." (*People v. Brooks* (2017) 3 Cal.5th 1, 98 (*Brooks*).)

This presumption of prejudicial bias may be overcome by either an affirmative showing that prejudice does not exist or by a reviewing court's examination of the record to determine whether " ' " 'there is a reasonable probability of actual harm to the complaining party.' " ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 332 (*Jackson*).) "A verdict must be reversed if the court ' " 'finds a substantial likelihood' " ' that the misconduct influenced the vote of one or more jurors." (*Ibid.*)

Where the misconduct consists of a juror's introduction of "extraneous material" into deliberations, we consider "(1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant." (*People v. Nesler* (1997) 16 Cal.4th 561, 578-579 (*Nesler*).) "The surrounding circumstances include 'the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant.' " (*Jackson*, *supra*, 1 Cal.5th at p. 332.)

11

We review for substantial evidence the trial court's credibility determinations and findings of historical fact, and we review independently whether prejudice arose from the misconduct. (See *Jackson*, *supra*, 1 Cal.5th at p. 332; *Brooks*, *supra*, 3 Cal.5th at p. 99.)

### 3. *Analysis*

Neither party challenges the propriety of the trial court's investigation and removal of Juror No. 5, but Taylor argues that the presumption of prejudicial bias raised by the remaining jurors' exposure to Juror No. 5's misconduct was not rebutted. We conclude that the presumption of prejudice has been rebutted because, on this record, there is no substantial likelihood that any of the remaining jurors were actually biased against Taylor. Accordingly, the trial court did not err in denying the motion for a mistrial. (See *Jackson*, *supra*, 1 Cal.5th at p. 334.)[4]

As reported to the trial court by the foreperson, Juror No. 5's misconduct consisted of her highly emotional focus during deliberations on her own personal experiences with domestic violence, including her husband's arrest, and the decision of a criminal defendant—believed by Juror No. 12 to be Juror No. 5's husband—to forego testifying to avoid committing perjury.[5]

_____

[4] Taylor appears to suggest that the trial court erred by failing to acknowledge that the law presumes prejudice. But absent indications to the contrary, we presume the trial court knew and followed the applicable law. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114; see also *People v. Harris* (2008) 43 Cal.4th 1269, 1304 (*Harris*) [trial court implicitly recognized presumption of prejudice after an incident of jury tampering by holding a prompt hearing to explore circumstances and possibility of bias].)

[5] In his opening brief, Taylor argues that Juror No. 5's personal comments "extended for a day and a half of deliberations." This claim is not supported by the record. When the jurors were questioned by the trial court, multiple jurors gave responses that indicated that Juror No. 5's personal comments were not limited to a singular instance. None of the jurors, however, indicated that that Juror No. 5's inappropriate comments encompassed the entirety of the jury's deliberations.

We conclude, however, that Juror No. 5's comments about her personal experiences were not substantially likely to have improperly influenced the other jurors. Juror No. 5 was removed from the jury and replaced with an alternate. (*People v. Tafoya* (2007) 42 Cal.4th 147, 193 [removal of juror who committed misconduct rebutted presumption of prejudice].) After the alternate was seated, the jury was instructed to deliberate anew. Additionally, several of the jurors made comments demonstrating that they understood that Juror No. 5's statements should not be considered during deliberations and were extraneous.[6] When asked, each of the jurors affirmed his or her ability to follow the trial court's instructions and deliberate appropriately despite their "struggles" with how to respond to Juror No. 5's misconduct, and Taylor does not identify anything in the record that would undermine the jurors' responses. A trial court can properly rely on a juror's assurance that he or she can remain impartial and is in the best position to observe a juror's demeanor and assess his or her credibility. (*Harris*, *supra*, 43 Cal.4th at pp. 1304-1305.) On the full record before us, crediting the trial court's implicit credibility determinations, we are satisfied that there is no substantial likelihood that any remaining juror was actually biased against Taylor.

Relying on *Nesler*, Taylor argues that Juror No. 5's misconduct was "so prejudicial in and of itself that it is inherently likely to have influenced a juror" and that bias was demonstrated without having to resort to a consideration of the surrounding circumstances. (*Nesler*, *supra*, 16 Cal.4th at pp. 578-579.) *Nesler*, however, involved a juror that received extraneous, damaging information about the defendant on trial. Even then, the California Supreme Court examined the nature of the misconduct and the record

---

[6] Juror No. 11 stated: "I just know there's a problem with one person and . . . I believe this person is bringing in preconceived notions and what they believe in and we weren't supposed [to]." And Juror No. 1 said that Juror No. 5 had brought up "past personal experiences that did not tie to the evidence that was actually presented."

13

as a whole before determining the existence of bias. (See *id.* at p. 582.) Judged objectively, Juror No. 5's statements, which did not expose the jury to extrinsic information about Taylor or Taylor's case, were not inherently prejudicial.

Likewise, we must reject Taylor's claim that the trial court erred by relying on the jurors' responses that they could still be fair. To support his argument, Taylor relies on several cases where a trial court found jury misconduct to be prejudicial despite the jurors' assurances of impartiality. These cases, however, are distinguishable as they all involved the jury's consideration of extrinsic evidence specific to the defendant on trial, clear indications of bias from the remaining jurors, or situations where the jurors were exposed to trial witnesses outside of the courtroom. (See *Marshall v. United States* (1959) 360 U.S. 310, 312 [jurors exposed to information in news article that was excluded from trial]; *Irvin v. Dowd* (1961) 366 U.S. 717, 727-728 [jurors said that they would be fair and impartial to the defendant but eight of the 12 jurors had said that they thought the defendant was guilty before the trial started]; *Turner v. Louisiana* (1965) 379 U.S. 466, 473 [two sheriff deputies that were in close and continual contact with the jurors later testified as witnesses for the prosecution].) None of these situations are present in this case.

For these same reasons, we also find no merit in Taylor's claim that Juror No. 5's misconduct deprived him of his Sixth Amendment right to confront and cross-examine witnesses. "When a juror communicates objective extrinsic facts regarding the defendant or the alleged crimes to other jurors, the juror becomes an unsworn witness within the meaning of the Confrontation Clause." (*Jeffries v. Wood* (9th Cir. 1997) 114 F.3d 1484, 1490, overruled on another ground by *Gonzalez v. Arizona* (9th Cir. 2012) 677 F.3d 383, 389, fn. 4; see also *Lawson v. Borg* (9th Cir. 1995) 60 F.3d 608, 612.) Here, Taylor's constitutional rights were not implicated because Juror No. 5 did not communicate extrinsic facts about him or his offenses.

14

We acknowledge that Juror No. 5's comment about another defendant's reason for not testifying had the potential to invite other jurors to speculate as to why Taylor did not testify. But the surrounding circumstances of the misconduct reflect no likelihood that her statement influenced the other jurors. (*Jackson*, *supra*, 1 Cal.5th at p. 332.) The record reflects that her statement was brief. Juror No. 12 indicated that Juror No. 5 made a single vague and difficult-to-follow reference to her spouse's decision not to testify. Juror No. 12 gave no indication of " 'any open discussion or agreement among the jurors evidencing a deliberate refusal to follow the court's instructions.' " (*People v. Hord* (1993) 15 Cal.App.4th 711, 726 [passing reference to defendant's failure to testify was not prejudicial juror misconduct]; see also *People v. Manibusan* (2013) 58 Cal.4th 49, 59 [fleeting reference to defendant's failure to testify not prejudicial juror misconduct].) Juror No. 12, the only one who appeared to have registered this aspect of Juror No. 5's comments, appropriately recognized it as improper. None of the other jurors mentioned any discussion of Juror No. 5's reference to her spouse's trial, let alone Taylor's decision not to testify, and each of them more broadly understood Juror No. 5's consideration of her personal experience of domestic violence and its aftermath to be improper.[7] Moreover, the jurors were properly instructed that a defendant has an absolute constitutional right not to testify and that it was not to consider "for any reason at all" the

---

[7] The trial court did not press the jurors for details about Juror No. 5's statements about perjury. The trial court explained that defense counsel "had indicated to me in chambers this morning some concern about probing too specifically or deeply into that topic with the other jurors because it might highlight the issue in a way that could further prejudice the jury if there had been any prejudice at all and so I did take that approach." Defense counsel's decision not to request a further inquiry on this subject may have been strategic as additional questioning may have amplified the significance of Juror No. 5's statement. (See *People v. Bell* (2019) 7 Cal.5th 70, 120, fn. 19.) But by failing to "seek a more extensive or broader inquiry" or "object to the trial court's course of action," Taylor has waived any challenge to the trial court's failure to examine the issue further. (*People v. Holloway* (2004) 33 Cal.4th 96, 126 (*Holloway*).)

15

fact that Taylor did not testify at trial. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83 [jurors are presumed to follow instructions].) For these reasons, we conclude it is not substantially likely that the remaining jurors were actually biased as a result of Juror No. 5's brief statement about perjury.

Accordingly, on this record, we conclude that the presumption of prejudice from Juror No. 5's misconduct was rebutted because there is no substantial likelihood that any remaining juror was actually biased against Taylor. The trial court accordingly did not err in denying the motion for a mistrial. (*Jackson*, *supra*, 1 Cal.5th 269, 334.)[8]

## B.  *Taylor's Request for A.D.'s Employment Records*

Taylor argues that the trial court abused its discretion by granting the prosecutor's motion to quash his subpoena duces tecum for A.D.'s employment records.[9] This abuse of discretion, he further contends, effectively denied him his right to present a defense and to confront witnesses. Taylor had sought the records on the theory that they were "necessary to discover the complaining witness [A.D.'s] mental state and/or emotional stability, to determine the complaining witness's tendency to make incredible claims and

---

[8] Citing to *Nesler*, *supra*, 16 Cal.4th 561, Taylor argues that Juror 5's misconduct amounts to "structural error" that requires reversal without an examination of prejudice. "[S]tructural errors not susceptible to harmless error analysis are those that go to the very construction of the trial mechanism—a biased judge, total absence of counsel, the failure of a jury to reach any verdict on an essential element.' " (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.) We need not decide whether individual juror misconduct amounts to structural error because here, we have determined that *Nesler* is distinguishable and the misconduct that did occur was *not* substantially likely to have biased any other juror.

[9] Initially in his opening brief, Taylor frames his argument as claim of evidentiary error consisting of the exclusion at trial of impeachment evidence that could have been derived from A.D.'s employment records. Because the trial court's pretrial ruling on the motion to quash prevented Taylor from seeking to admit any of the subpoenaed records at trial, we construe Taylor's arguments as a claim that the error lay in the trial court's pretrial ruling.

16

to be untruthful; to determine the complaining witness's reliability as a historian; the complaining witness's behavior while intoxicated, and to cross-examine and impeach the complaining witness." We conclude that the trial court did not abuse its discretion because defense counsel failed to show good cause to enforce the subpoena.

"Although no substantial showing is required to *issue* a criminal subpoena duces tecum . . . in order to *defend* such a subpoena against a motion to quash, the subpoenaing party must at that point establish good cause to acquire the subpoenaed records. In other words . . . . the defendant must show 'some cause for discovery other than "a mere desire for the benefit of all information." ' " (*Facebook, Inc. v. Superior Court of San Diego County* (2020) 10 Cal.5th 329, 344 (*Facebook*) ; see also § 1326.) The California Supreme Court has described several factors relevant to a trial court's assessment of good cause. As is pertinent here, these factors include whether the defendant has shown "a ' "plausible justification" ' . . . by presenting specific facts demonstrating that the subpoenaed documents are admissible or might lead to admissible evidence" that will reasonably assist in preparation of the defense, and whether production of the records would "violate a third party's 'confidentiality or privacy rights.' " (*Facebook*, *supra*, at pp. 345-347.) We review a ruling on a motion to quash for an abuse of discretion. (*Id.* at p. 359.)

Here, the subpoenaed employment records manifestly implicated third-party privacy rights the courts have long recognized as protected by constitution and statute. (*San Diego Trolley, Inc. v. Superior Court* (2001) 87 Cal.App.4th 1083, 1097 [personnel records and employment history are constitutionally protected], overruled on other grounds by *Williams v. Superior Court* (2017) 3 Cal.5th 531; see also Cal. Const., art. I, § 1; Code. Civ. Proc., § 1985.6; cf. *Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 1250, 1261-1262 [protection against "invasion of personal privacy" underlies exemption of personnel records from disclosure under public records

17

act].)  The breadth of Taylor's request reflects the scope of invasion contemplated: "disciplinary investigation records, separation agreements, findings related to alcohol consumption in the workplace, reports related to allegations of misconduct made by [A.D.], reports related to false statements made by [A.D.], and documentation of [A.D.'s] behavior while intoxicated in the workplace."

Against A.D.'s privacy interest, Taylor through his counsel offered only conclusory assertions of relevance to potential impeachment, devoid of "specific facts" that would demonstrate that the subpoenaed documents "might lead to admissible evidence that [would] reasonably ' "assist [Taylor] in preparing his defense." ' " (*Facebook*, *supra*, 10 Cal.5th at p. 345; *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 538 (*Pitchess*) [requiring adequate specificity to preclude possibility of a " 'fishing expedition' "].)  A.D.'s former employment ended in 2011, four years before the charged offenses took place in 2015.  (See, e.g., *People v. Gonzalez* (1967) 66 Cal.2d 482, 500 [trial court properly determined that third party's reputation for violence seven years before offenses "was too remote to have present probative value"].)  Although defense counsel offered a generic theory of relevance, he offered no specific facts as a basis for his assertion that the employment records would produce impeachment material.[10]

As defense counsel did not offer specific facts to justify obtaining A.D.'s protected employment records, we conclude that the trial court did not abuse its discretion when it granted the People's motion to quash.  (*Facebook*, *supra*, 10 Cal.5th at p. 359.)  And

---

[10] Taylor on appeal relies on a further rationale proffered by defense counsel during an in camera hearing which postdated and was unrelated to the trial court's ruling on the motion to quash Taylor's subpoena for A.D.'s employment records.  But at no time after the ruling on the motion to quash did defense counsel renew his request to obtain A.D.'s employment records.  In our deferential review for abuse of discretion, we consider only the arguments before the trial court when it was asked to exercise that discretion.

18

because Taylor has not demonstrated that the trial court erred by granting the motion to quash, we find no merit in Taylor's derivative claim that denying him access to the employment records violated his Sixth and Fourteenth Amendment rights to confront witnesses and present a complete defense. (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1233 [application of discovery statutes did not demonstrate violation of right to present defense], abrogated on a different ground as stated in *People v. Rangel* (2016) 62 Cal.4th 1192; see also *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 [application of ordinary rules of evidence do not infringe on a defendant's right to present a defense].)

## C. *Review of A.D.'s Psychiatric Records*

The month before trial, the trial court reviewed A.D.'s psychiatric records in camera and denied without prejudice Taylor's motion for their release. The trial court stated: "The Court will continue to review and reflect upon the quality of this material as the testimony unfolds throughout the course of the trial and will revisit the question if it appears based on the testimony in the trial that the importance and materiality of the records changes the balance with respect to the right to privacy and interest of the holder privileges with respect to the documents." Taylor did not thereafter renew his motion. Taylor now argues that this court should independently review A.D.'s psychiatric records. Because Taylor was not entitled to pretrial disclosure of A.D.'s psychiatric records and did not ultimately request their disclosure at trial, we discern no legal basis for our intrusion on A.D.'s privacy now.

Psychiatric records are generally protected from discovery by the psychotherapist-patient privilege. (Evid. Code, § 1014.) Nevertheless, because a witness's mental illness or emotional instability can be relevant to credibility, a party may cross-examine the witness as to whether the mental illness affects the witness's ability to recall, perceive or describe events. (*People v. Gurule* (2002) 28 Cal.4th 557, 592 (*Gurule*).) "When a

19

defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon . . . to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve." (*People v. Hammon* (1997) 15 Cal.4th 1117, 1127 (*Hammon*).) To determine whether a defendant's need for the information outweighs the witness's interest in confidentiality, a trial court may hold an in camera hearing to examine the privileged material. (See § 1326, subd. (c).) However, a defendant does not generally have a *pretrial* right to a witness's privileged psychiatric information. (*Hammon*, *supra*, at p. 1127; *Gurule*, *supra*, 28 Cal.4th at p. 592.) "Before trial, the court typically will not have sufficient information to conduct the inquiry [balancing defendant's Sixth Amendment rights and the witness's rights]; hence, if pretrial disclosure is permitted, a serious risk arises that privileged material will be disclosed unnecessarily." (*Hammon*, *supra*, at p. 1127.)

Moreover, "[a] tentative pretrial ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for the appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself." (*Holloway*, *supra*, 33 Cal.4th at p. 133.)

Taylor acknowledges that he is not entitled to pretrial disclosure of privileged records but argues that he is nonetheless entitled to an independent appellate review of the sealed records. (*Hammon*, *supra*, 15 Cal.4th at p. 1127; *Gurule*, *supra*, 28 Cal.4th at p. 592.) Taylor contends that by undertaking pretrial review of the records, the trial court "implicitly acknowledged" that he may have been able to meet his burden to obtain disclosure of the privileged material. Taylor's argument inverts the customary appellate presumption: we do not imply findings in contravention of the judgment but in its favor: " ' "[A]ll intendments and presumptions are indulged to support [a judgment] on matters as to which the record is silent, and error must be affirmatively shown." ' " (*People v. Giordano* (2007) 42 Cal.4th 644, 666.) Moreover, assuming the trial court had in fact

20

been open to pretrial disclosure upon an appropriate showing, its willingness to entertain the possibility conferred on Taylor no entitlement to that disclosure.

Because the trial court was explicit that its pretrial denial of disclosure was without prejudice and that it was willing to revisit the propriety of disclosure when A.D. testified, Taylor had a clear opportunity and obligation to renew his request for disclosure in order to preserve the issue for appeal. As such, to the extent Taylor challenges the trial court's failure to disclose the documents at all, including during trial consistent with *Hammon*, his failure to press for a final ruling on the matter has forfeited his appellate claim here. (*Holloway*, *supra*, 33 Cal.4th at p. 133.)[11] We therefore decline to conduct an independent appellate review of the subpoenaed documents.[12]

---

[11] Nor may we reject the possibility that defense counsel decided that renewing his request at trial was unnecessary. As defense counsel argued during his closing, A.D. admitted her struggles with alcohol and that she had experienced delusional thoughts, as when she checked Taylor's back for angel wings.

[12] The sealed records reviewed by a trial court, like all exhibits, are part of the normal record on appeal, although they are not transmitted to a reviewing court except upon request. (Cal. Rules of Court, rules 8.320(e), 8.224.) Neither party requested transmission of the sealed records, as provided by California Rules of Court, rule 8.224(a). After a "due and diligent" search, the clerk of the superior court reported to us that the documents cannot be located. Because we have the authority to order augmentation or correction of the record under California Rules of Court, rule 8.155(a)(1), the trial court's loss of the subpoenaed documents does not factor in our conclusion on the merits: were it necessary, we would direct the trial court to order anew the (re)production of the documents or to otherwise provide a record of its review. We remind the trial court that preserving the documents in accessible form or, at a minimum, preserving a detailed record of its review, facilitates appellate review and is less burdensome than correction of the record after the fact. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1225-1230 [trial court ruling on *Pitchess* motion should make record of what documents it examined].)

21

**D.** *Retroactivity of Senate Bill No. 567 and Assembly Bill No. 518*

Both Senate Bill No. 567 and Assembly Bill No. 518 became effective January 1, 2022, after Taylor was sentenced but while his appeal remained pending. In supplemental briefing, the parties agree that remand for resentencing is required because he is entitled to retroactive application of Senate Bill No. 567, which amended section 1170, and Assembly Bill No. 518, which amended section 654. We concur.

Senate Bill No. 567 amended section 1170 to make the middle term the presumptive sentence. (§ 1170, subd. (b)(1).) Moreover, section 1170, subdivision (b)(2) states in pertinent part: "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at a trial by the jury or by the judge in a court trial. Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements. The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense."

As Taylor's case was not yet final when these amendments to section 1170 took effect, he is entitled to retroactive application of the amended version of the statute as it is an ameliorative change in the law and nothing in Senate Bill No. 567 indicated that the Legislature intended the change to apply prospectively. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; *In re Estrada* (1965) 63 Cal.2d 740.)

Here, the trial court imposed upper terms for counts 2 through 10. When selecting the upper terms, the trial court expressly stated that it considered "the ongoing pattern of violent conduct, the selection and vulnerability of the victim in this case, the callousness,

22

cruelness, extreme violence that was inflicted, the severity of the injuries imposed on multiple occasions, the psychological and physical injuries, the lasting nature of those injuries, the escalating criminal conduct, and the totality of the circumstances." None of these factors in aggravation were either stipulated to by Taylor or found true by a jury. Thus, we must reverse the judgment and remand the matter for resentencing.

In light of our reversal, we do not need to address Taylor's additional argument that he is entitled to resentencing based on the ameliorative changes to the law effectuated by Assembly Bill No. 518, which amended section 654. Because we are remanding the matter for resentencing, the trial court may reconsider all of its prior sentencing decisions as to all counts under the statutes that are now in effect, which includes the newly amended version of section 654. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## III.    DISPOSITION

The sentence as to counts 2 through 10 is vacated, the judgment is reversed, and the matter is remanded for resentencing under Penal Code section 1170, subdivision (b), as amended by Senate Bill No. 567. On remand, the trial court may reconsider all of its sentencing decisions in light of the statutes that are now in effect, including the version of Penal Code 654 as amended by Assembly Bill No. 518.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Taylor*
H046288